UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TORAN K. GREEN,

      Petitioner,

v.                                  Case No.  4:15cv350/MW/CJK

FLORIDA DEPARTMENT OF
CORRECTIONS SECRETARY,

      Respondent.

_____/

<u>REPORT AND RECOMMENDATION</u>

Before the court is a petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed an answer, submitting relevant portions of the state court record.  (Docs. 17, 18).  Petitioner replied.  (Doc. 29).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of the issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the court

show that petitioner is not entitled to habeas relief, and that the petition should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

On October 15, 2008, petitioner was charged by information filed in Gadsden County Circuit Court Case No. 08-CF-622, with armed robbery with a firearm (Count I) and possession of a firearm by a convicted felon (Count II). (Doc. 18, Ex. A, p. 6).[1] On November 17, 2009, petitioner went to trial on the armed robbery count and was found guilty as charged with a jury finding that petitioner actually carried and possessed a firearm during the commission of the offense. (Ex. A, p. 46 (jury verdict); Ex. B (trial transcript)). Count II was nolle prossed. Petitioner was adjudicated guilty of armed robbery with a firearm, adjudicated a prison release reoffender, and sentenced to life in prison. (Ex. C (sentencing transcript); Ex. A, pp. 48-56 (judgment and sentence)). The Florida First District Court of Appeal (First DCA) affirmed the judgment on January 10, 2011, per curiam and without a written opinion. *Green v. State*, 51 So. 3d 1157 (Fla. 1st DCA 2011) (Table) (copy at Ex. H).

---

[1]Citations to exhibits are to those provided at Doc. 18. If a page of an exhibit has more than one page number, the court's citation refers to the Bates stamp number.

On April 21, 2011, petitioner filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Ex. J, pp. 1-29). The state circuit court appointed counsel and held an evidentiary hearing. (Ex. J, pp. 40 (order appointing counsel); Ex. K (evidentiary hearing transcript)). After the hearing, the circuit court denied the motion. (Ex. J, pp. 43-47). The First DCA affirmed, per curiam and without a written opinion. *Green v. State*, 152 So. 3d 568 (Fla. 1st DCA 2014) (Table) (copy at Ex. P). The mandate issued January 12, 2015. (Ex. S).

Petitioner filed his federal habeas petition on July 13, 2015. (Doc. 1). The petition raises one claim of ineffective assistance of trial counsel. Respondent concedes that petitioner exhausted the claim, but asserts that the state court's rejection of it was not contrary to, or an unreasonable supplication of *Strickland v. Washington*, 466 U.S. 668 (1984), nor was the state court's decision based on an unreasonable determination of the facts in light of the evidence presented in state court. (Doc. 17, pp. 20-47).

RELEVANT LEGAL PRINCIPLES

Section 2254 Standard of Review

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254(d) provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]

The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas

---

[2]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme

Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was *per se* ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington, supra*, at 102-103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (*quoting Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable

determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the

Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

<u>Clearly Established Federal Law Governing Claims of Ineffective Assistance of Counsel</u>

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set out a two-part inquiry for ineffective assistance of counsel claims. The petitioner must show that (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. 466 U.S. at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness. Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (*quoting Strickland*, 466 U.S. at 694).

Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v.*

*Titlow*, 571 U.S. —, 134 S. Ct. 10, 17, 187 L. Ed. 2d 348 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)). "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 134 S. Ct. at 17 (quotation marks and alterations omitted).

With regard to prejudice, the *Strickland* court emphasized that a defendant must show a "reasonable probability" of a different result. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d

284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court in *Richter* explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## DISCUSSION

Petitioner's Claim    "Petitioner Green was denied his constitutional right to effective assistance of counsel and due process of law where trial counsel failed to object during trial on the basis of discovery violation when it became evident through State witness' testimony that the State had willfully withheld the name of a suspect in the case." (Doc. 1, p. 5).

The following facts, drawn from the trial transcript, provide context to petitioner's claim. At trial, the State presented evidence that petitioner purchased a Tracphone (a prepaid cell phone) at a CVS pharmacy, then used that Tracphone to call one of the victims in this case – Cary Davis. Mr. Davis owned a business called Gator Corp, which purchased junks cars, stripped them down for parts and sold the

parts. Mr. Davis purchased inventory by meeting prospective car sellers at the site of their vehicles, purchasing the cars with cash, and transporting them to Gator Corp. in Tallahassee. (Ex. B, p. 59). On September 17, 2008, petitioner, using the Tracphone he had just purchased at CVS, called Gator Corp. and spoke to Mr. Davis. (Ex. B, p. 68). Petitioner disguised his voice as a much older gentleman and identified himself as "Mr. Williams". (Ex. B, p. 68). Petitioner told Davis he had a number of junk cars he wanted to sell, and arranged a meeting with Davis for September 17, 2008, near Quincy, Florida. (Ex. B, pp. 68-69). Mr. Davis drove to the location he and petitioner arranged, but petitioner did not appear. (*Id*.). Davis called petitioner back, and petitioner gave Davis the excuse that he was senile and had forgotten he had a doctor's appointment that day. Petitioner told Davis he would call him back soon to arrange another meeting. (Ex. B, p. 69). One week later, on September 24, 2008, petitioner called Davis from the same Tracphone number and, again identifying himself as "Mr. Williams", arranged a new meeting with Davis for September 24, 2008, at a different location. (Ex. B, pp. 61-63, 69). Mr. Davis arrived at the arranged location on September 24, 2008, with his employee Robert Bivens, Jr. (Ex. B, pp. 63-64). Davis and Bivens met petitioner and his co-defendant. (Ex. B, pp. 64-65). Petitioner talked with Davis for a short time and

directed Davis to turn to get a view of the cars for sale. (Ex. B, p. 65). Davis turned, but did not see any cars. (Ex. B, p. 65). When Davis turned back to face petitioner, he was met with petitioner pointing a gun to Davis' head. (Ex. B, pp. 65-66). Petitioner ordered Davis to the ground, and Davis complied. (Ex. B, p. 65-66.). Petitioner, still holding the gun to Davis' head, ordered Davis to "give me the motherfucking money." (Ex. B, p. 65). Davis begged for his life and emptied his pockets, which included $2800 in cash, two cell phones, and keys to Davis' truck. (Ex. B, pp. 65-66). As petitioner was robbing Davis, his co-defendant was robbing Mr. Bivens with a gun to his mouth. (Ex. B, p. 66). Petitioner picked up the items from Davis' pockets, threw Davis' keys back to him and ordered Davis to "get out of there." (Ex. B, p. 65). Davis and Bivens got into Davis' truck, drove off, and reported the incident to law enforcement. (Ex. B, pp. 67-68). Later that evening, Mr. Davis called one of his stolen cell phones to check his voicemail. (Ex. B, pp. 73-74). There was a voicemail from petitioner's Tracphone number. Shortly after the robbery, petitioner's Tracphone had accidentally dialed Davis' stolen cell phone, and the call went to voicemail which then began recording. On the voicemail recording, Davis could hear three voices, two of whom were describing the robbery in detail and making fun of how Davis begged for his life. (Ex. B, p. 74). Mr. Davis

testified that he recognized one of the voices on the voicemail recording – the voice of the person to whom the robbery was being described – as Cornell Brown. (Ex. B, p. 79). Davis knew Cornell Brown because Davis had allowed Brown to work with him to learn the junk car business so Brown could start his own business. (Ex. B, pp. 79-80). Davis was very familiar with Brown's voice as he had had extensive dealings with Brown at work, hanging out and having dinner together. (Ex. B, pp. 79-80). Davis testified that although Cornell Brown's voice was on the voicemail in the company of the two robbers, Davis was certain Brown was not one of the robbers because he knew what Brown looked like, and neither of the robbers was Brown. (Ex. B, p. 79-80). Davis confirmed during cross-examination that Cornell Brown was not one of the men who robbed him and Bivens. (Ex. B, p. 96). Defense counsel inquired:

> Q [Defense counsel Winn]: Okay. And you told Investigator Jenkins that on that voicemail recording you have, you can identify Cornell Brown, correct?
>
> A [Cary Davis]: I'm pretty sure that I told him that.
>
> Q: Okay. You're pretty sure?
>
> A: Uh-huh.
>
> Q: All right. Do you know how many times you told him that?

A: No, sir.

Q: Okay.

A: But Cornell Brown isn't the one who robbed me.

Q: Cornell Brown's on that voicemail, isn't he?

A: But he's not the one who robbed me.

(Ex. B, p. 96).

Mr. Davis unequivocally identified petitioner as the man who robbed him. Davis identified petitioner as the robber twice in court, and once prior to trial in a photo lineup Davis viewed the day after the robbery. (Ex. B, pp. 64-65, 71-72, 80-81). In the photo lineup, Davis circled the photograph of petitioner and wrote "This is the one" next to petitioner's photograph. (Ex. B, pp. 71-73).

Investigator Jenkins investigated the robbery. Investigator Jenkins testified that he worked backwards from Mr. Davis' cell phone and, by using phone records, was able to identify the phone number belonging to the fictitious "Mr. Williams". The phone number was 850-273-0383. (Ex. B, p. 135). Jenkins determined that the phone number was assigned to a Tracphone. (Ex. B, pp. 138-39). Jenkins tracked the Tracphone and learned that it was purchased at a CVS store and activated on September 17, 2008. (Ex. B, pp. 137-41). The person who activated the Tracphone

gave the name "Darril Williams", and provided a secondary contact number of 850-726-0627. (Ex. B, pp. 141-42). Jenkins recognized 850-726-0627, because he had had frequent phone contact with the person who used that number, but Jenkins could not immediately place who that person was. (Ex. B, pp. 144-46). Jenkins used another investigator's phone to call 850-726-0627, and petitioner answered. (Ex. B, pp. 144, 146). Jenkins immediately recognized petitioner's voice. (Ex. B, p. 148). Jenkins, not wanting to alert petitioner to the robbery investigation, told petitioner he lost his cell phone and was calling petitioner to verify whose number it was. (Ex. B, pp. 146-47). Jenkins was familiar with petitioner "in a professional capacity" and had spoken to petitioner "hundreds of times" over an extended period, always using the 850-726-0627 number. (Ex. B, pp. 147-48). The 850-726-0627 number was the only number Jenkins used to contact petitioner, and was the only number petitioner used to contact Jenkins. (Ex. B, p. 147).

Jenkins went to the CVS store, pulled the security video from September 17, 2008, and viewed the video. (Ex. B, pp. 148-149). The video showed petitioner purchasing the Tracphone. (Ex. B, p. 149). Investigator Jenkins showed Mr. Davis and Mr. Bivens two different photo lineups. (Ex. B, pp. 152-153). The first lineup did not include a photograph of petitioner. Neither victim identified anyone out of

the first lineup as one of the robbers. (*Id*.). Jenkins showed Davis and Bivens a second photo lineup. The second lineup included a photograph of petitioner. Mr. Bivens did not identify anyone out of the lineup and told Jenkins he never got a good look at either robber. (Ex. B, p. 153). Mr. Davis circled the photograph of petitioner and identified him as the robber who pointed the gun at his head and demanded money. (Ex. B, p. 154). Investigator Jenkins called the voicemail on Davis' stolen cell phone and listened to the voicemail containing the three voices. (Ex. B, p. 155). Jenkins recognized petitioner's voice on the voicemail as one of the individuals describing in detail how he robbed Mr. Davis. (Ex. B, p. 155). Jenkins was familiar with petitioner's voice due to the hundreds of times he had spoken with petitioner over the phone, and due to petitioner's having the distinctive trait of sometimes stuttering. (*Id*.). Investigator Jenkins arrested petitioner. (Ex. B, pp. 155-56). At the time of petitioner's arrest, he was in possession of his personal cell phone. (Ex. B, p. 156). The display on petitioner's personal cell phone identified the number assigned to that phone as 850-726-0627. (Ex. B, pp. 156-58).

During cross-examination, defense counsel questioned Investigator Jenkins about the voicemail recording on Mr. Davis' stolen cell phone:

> Q [Defense Counsel Winn]: When did Mr. Davis tell you that the person on the voicemail was Cornell Brown?

A [Investigator Jenkins]:  At some point when he gave – when he gave me the pass code and stuff to his phone, he said he recognized that one voice as Cornell Brown.

Q:  Do you know Cornell Brown?

A:  Yes, sir, I do.

Q:  Did you recognize his voice?

A:  No, sir, I didn't.

Q:  You didn't.  But a victim recognizes the voice on the voicemail, correct?

A:  That's what he says, yes, sir.

Q:  And you went out and spoke to Mr. Brown, correct?

A:  No, I didn't, actually.

Q:  And when you did that, you didn't – you never went out and spoke to Mr. Brown?

A:  Not to my recollection.

Q:  The person that Mr. Davis can identify as specifically on his voicemail you didn't go out and speak with?

Q:  No, not at that particular time I didn't.

Q:  Did Mr. Davis ever tell you that it was Cornell Brown?

A:  Yes, sir, he did.

Q:  And when did he tell you that?

A:  I want to say maybe the same day he gave me the information he gave in his voicemail.

Q:  Great.  And did you put that in your report?

A:  Did I put what in my report, sir?

Q:  That he told you that the person on the voicemail was Cornell Brown?

A:  No, sir, I didn't put it [in] my report.

Q:  No important?

A:  It was very important.

Q:  Okay.

A:  It's in my notes.

Q:  Just left it out?

A:  It's in my – it's –

Q:  It's in your notes?

A:  – in the file.  Yes, sir.

Q:  It's in the file?

A:  Yes, sir.

Q:  Did you give that to the state?

> A:  No, sir, but I indicated to the state that he was identified as one of the persons on the voicemail.

(Ex. B, pp. 170-71).

The defense theory, presented through petitioner's testimony, was that although petitioner bought the Tracphone, he never used it because he mistakenly left it, unopened, in Cornell Brown's truck.  (Ex. B, p. 234-38).  Petitioner disclaimed any knowledge of the robbery.  (Ex. B, pp. 243-44).

Petitioner claims trial counsel Jason Winn was ineffective for failing to object and request a hearing pursuant to *Richardson v. State*, 246 So. 2d 771 (Fla. 1971), on the grounds that the State violated discovery rules by failing to disclose the name of Cornell Brown as a suspect.[3]  Petitioner asserts that disclosure was required pursuant to the defense's discovery request for "any taped, recorded, or transcribed statement by witness".  (Doc. 1, pp. 5-6).  Petitioner claims he was prejudiced because had counsel argued a discovery violation, the trial judge would have continued the trial to allow defense counsel to investigate Brown as a suspect, which could have led to the discovery of exculpatory evidence.  (Docs. 1, 29).

---

[3] A *Richardson* hearing is held to determine whether the State committed a discovery violation in contravention of the Florida Rules of Criminal Procedure and, if so, whether the non-compliance resulted in prejudice to the defendant's ability to prepare for trial.  *Richardson*, 246 So.2d at 775.

Petitioner presented this claim to the state courts as Ground Three of his Rule 3.850 motion. (Ex. J, pp. 22-28). The state circuit court appointed counsel and held an evidentiary hearing. Petitioner emphasized in his evidentiary hearing testimony that although he was aware of Cornell Brown because he left his Tracphone in Brown's truck, he was not aware Mr. Davis had identified Brown's voice on the voicemail. Petitioner asserted that Davis identified Brown "as a suspect" and that had he known Brown was a "suspect", defense counsel could have investigated Brown and spoken to him. (Ex. K, pp. 37-38). Petitioner admitted, however, that Brown would not have confessed to committing the robbery or testified that petitioner had nothing to do with it.

> THE COURT: All right. I was going to ask one question. And Mr. Harvey [postconviction counsel] and Mr. Grow [assistant state attorney], I don't know whether I should ask it or not. So before you answer it, give them a chance to object, okay.

> THE DEFENDANT: Yes, sir.

> THE COURT: Which was, did I hear him [petitioner] say or did he, when he was in prison with Mr. Brown, has Mr. Brown now told him that –

> THE DEFENDANT: He was an informant. Oh, my bad, sir.

> MR. HARVEY: Judge, you can ask it.

> THE COURT: – that Mr. Brown's the robber?

MR. HARVEY:  I don't think he said that.

THE COURT:  And that you, Mr. Green, didn't have anything to do with it.  Has Mr. Brown confessed to this?

THE DEFENDANT:  Mr. Brown said that he was an informant and said that even though Investigator Jenkins had called him and was like, hey, man, you owe me, he just swept it up under the rug.  But I told Mr. Brown that he could have freed me.  And he was like, you know, man, you know, the games that I play.  I'm an informant.

BY MR. HARVEY:

Q:  But he didn't make any confession to you.

A:  No, he didn't make them.

(Ex. K, pp. 44-45).

The state postconviction court also heard the testimony of defense counsel

Attorney Winn.  Winn testified:

Q [ASA Grow]:  Was Mr. Brown made aware to you prior to trial?

A [Attorney Winn]:  Mr. Brown was not.  Well, I knew about Mr. Brown.  Mr. Hale [the prosecutor] knew about Mr. Brown.  Mr. Green identified Mr. Brown from the very beginning as being the person that he had left his phone in the vehicle.  So there wasn't any secrecy about Cornell Brown.  At the time I think Mr. Brown was in DOC custody. So that wasn't a secret.

I think once – and to that point, it was – well, Mr. Green was questioned about other people that may or may not have been involved at the time prior to trial with one of the investigators, myself, and Mr.

Green present.  And midway through that meeting the investigator didn't believe that Mr. Green was being truthful and walked out.

So I don't think there was any question that we knew Mr. Brown existed.  The State didn't charge him.  I certainly made a big argument of that during closing, asking where is Mr. Brown, why wasn't he there. . . .

Q:  Did Mr. Brown or did Mr. Green tell you from the beginning that Mr. Brown was to him the one who did this and not him?

A:  No.  No, just that he didn't.  Mr. Green told me that Mr. Green didn't do it.

. . . .

Q:  . . . On the track phone did you ever try to pull any voice recordings or anything like that?  Voice mails or –

A:  No.

Q:  – messages?

A:  Not from this track phone.

Q:  Okay.  From any other phones?

A:  Well, we had the voice recordings from the alleged victim's phone that was the voice mail that occurred right after the incident.

Q:  Okay.

A:  That was the only one that I listened to, and I would have played that for Mr. Green as well.

(Ex. K, pp. 61-63). Attorney Winn testified that he knew of Cornell Brown as far back as September 22, 2009. (Ex. K, p. 64).

> Q [Assistant State Attorney Grow]: So there wasn't any prejudice to you with Mr. Brown's name coming up during trial. He wasn't an unknown factor.

> A [Attorney Winn]: No, it was not an unknown.

(Ex. K, pp. 64-65).

During questioning by petitioner's postconviction counsel, Attorney Winn was asked about Mr. Davis' revelation at trial that he told Investigator Jenkins he recognized Cornell Brown's voice on the voicemail. This exchange occurred:

> Q [postconviction counsel Harvey]: As far as you're concerned that was the first time that you – that it was revealed to you that in fact the victim had identified Cornell Brown as one of the robbers, was at trial. Is that right?

> A: No. I would disagree with that statement.

> Q: Okay.

> A: Because he wasn't identified as one of the robbers. He was identified as being on the audio tape.

> Q: Of the robbers right after the robbery?

> A: No, he was identified as being on the audio tape after the incident occurred. Whether or not he was one of the people that was involved in the robbery or not was not –

Q:  Okay.

A:  I don't know.

. . . .

A:  . . . [T]he State's theory was – yes, that that was a conversation recorded between people that were either directly or indirectly involved with the robbery.

And all along there was never a question as to there being two people on the scene.  Both victims identi – or suggested there were two people there.

Q:  So my final question on that issue is when you found that out, why didn't you ask the judge to inquire as to why you-all hadn't been given the name of Cornell Brown, I guess, as a person that had been identified as on that tape by the victim?

A:  Why didn't I –

Q:  Why didn't you say *Richardson* hearing, that's what I'm trying to get at.

A:  At the moment that the victim alleges that he knows one of the people on the audio tape.  Going by what I can recall, I didn't make a note of it because Cornell Brown wasn't someone new to us.  We knew about Cornell Brown.  Whether or not he was identified there or not still didn't make a difference as to whether or not Mr. Green was identified there or not.

(Ex. K, pp. 67-69).

Prosecutor Bobby Hale testified at the postconviction evidentiary hearing that

there were three people involved in the robbery – two people that held up the two

victims and a third person who drove the getaway car. (Ex. K, p. 84). Attorney

Hale's belief was that Cornell Brown was the getaway driver in the robbery. (Ex.

K, p. 83). Mr. Davis actually knew Cornell Brown, so Mr. Brown's name came up

very quickly. (Ex. K, p. 83). "We were pretty certain he was involved. I just didn't

think we had enough to charge him as a principal to the robbery." (Ex. K, p. 83).

Asked why the State did not disclose Cornell Brown as a Category A witness,

Attorney Hale answered: "Everybody knew about his name though. It's not like it

was a surprise. As far as why I didn't, I don't think, to my knowledge he had no

exculpatory evidence. I didn't think I had any kind of duty, and I still don't think I

had any kind of duty, to turn his name over. Especially if the defense already knows

about him." (Ex. K, pp. 84-85). Petitioner had been an informant for some time for

the sheriff's office and this is how Investigator Jenkins knew his voice on the "butt

call" recording. (Ex. K, p. 86). On cross-examination, Hale was asked whether he

knew prior to trial that the victim identified Brown's voice on the voicemail

recording, to which Hale responded: "I knew Brown's voice was on there. I don't

know whether or not I knew that Mr. Davis said – I mean I think I could come to

that conclusion that Mr. Davis knew." (Ex. K, p. 87). Asked whether at any point

he provided that information to the defense through discovery, Attorney Hale

responded, "Like I said before, I provided the phone – the voice mail to the defense. I didn't specifically say if you listen to this part you will hear the defendant speak about Mr. Brown and refer to him as Nails. No, sir, I don't think I did that. But it was pretty – it was wellknown [sic]. And I think this was – this came out at deposition as well. Mr. Davis knew Mr. Brown so he knew Mr. Brown's voice. And he was adamant that Mr. Brown was involved and he wanted us to charge Mr. Brown. I just didn't think we quite had enough to do that which is why I asked Mr. Green whether or not he wanted to assist us in that regard. And that, I thought, was one of the key features at the trial is that when the defense is trying to put it off on Mr. Brown, the victim, Mr. Davis, knows Mr. Brown and can say conclusively that that's not him that robbed me." (Ex. K, pp. 87-88).

After hearing, the state circuit court denied relief in a written order as follows:

**Ground 3:  Failure to Request Richardson Hearing Regarding Cornell Brown**

As to Ground 3, Mr. Green failed to establish either ineffective assistance or prejudice. Mr. W[i]nn testified that he was well aware of the existence of witness Cornell Brown, prepared for his testimony and saw no basis to assert a discovery violation. In addition, Mr. Green failed to demonstrate any meaningful prejudice in any inadequacy in the State's disclosures related to Cornell Brown.

(Ex. K, pp. 46-47). The circuit court concluded: "Mr. Green failed to carry his burden to prove either deficient performance or prejudice as to any of the issues raised. The motion must be and therefore hereby is DENIED." (Ex. K, p. 47). The First DCA summarily affirmed. (Ex. P).

The relevant decision for purposes of 28 U.S.C. § 2254 is the First DCA's summary affirmance, which is the final state court adjudication on the merits of petitioner's claim. *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227, 1235 (11th Cir. 2016) (defining the relevant decision for purposes of § 2254 review as the state appellate court's summary affirmance of the lower tribunal's decision), *cert. granted*, No. 16-6855, 2017 WL 737820 (U.S. Feb. 27, 2017). Where, as here, "the last adjudication on the merits provides no reasoned opinion, federal courts review that decision using the test announced in *Richter*." *Wilson*, 834 F.3d at 1235. The *Richter* test provides that "[w]here a state court's decision is unaccompanied by an explanation," a petitioner's burden under section 2254(d) is to "show[ ] there was no reasonable basis for the

state court to deny relief." *Richter,* 562 U.S. at 98. "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court." *Id.* at 102.

Under the *Richter* test, petitioner must establish there was no reasonable basis for the First DCA to affirm the denial of his ineffective assistance claim. In reviewing the reasonableness of the First DCA's decision, this court may, but is not required to, look to the reasoning of the state court below (the state circuit court). The Eleventh Circuit explained in *Wilson*:

> When the reasoning of the state trial court was reasonable, there is necessarily at least one reasonable basis on which the state [appellate] court could have denied relief and our inquiry ends. In this way, federal courts can use previous opinions as evidence that the relevant state court decision under review is reasonable. But the relevant state court decision for federal habeas review remains the last adjudication on the merits, and federal courts are not limited to assessing the reasoning of the lower court.

834 F.3d at 1239.

Petitioner asserts that the state court's decision was "contrary to the trial testimonies of the victim (Carey Davis) and Investigator Jenkins" (doc. 1, p. 7), and was "contrary to the record of the evidentiary hearing" (doc. 29, p. 3). Petitioner

also argues that the state court's decision was an unreasonable application of the *Strickland* standard. (Doc. 1, p. 7; Doc. 29, p. 1).

The state circuit court's factual determinations are amply supported by the trial and postconviction records. Based on the evidence in the record, the First DCA reasonably could have concluded that defense counsel was not deficient for failing to argue that the State committed a discovery violation. Contrary to petitioner's assertion that Mr. Davis identified Cornell Brown as "a suspect", Davis did not identify Brown as one of the men who robbed him, and there was no undisclosed "taped, recorded, or transcribed statement" by Davis identifying Brown. In addition, the defense was well aware of Brown's potential involvement and of the voicemail recording containing his voice. Petitioner has not demonstrated any impropriety in the State's failure to tell the defense that Davis recognized Brown's voice on the voicemail as a third person listening to the robbers discuss the robbery.

The First DCA also reasonably could have concluded that petitioner failed to establish prejudice, because petitioner failed to show there was a reasonable probability a *Richardson*-based objection or a continuance would have changed the outcome of petitioner's trial. There was no meritorious basis for such motion. Even if the defense was granted a continuance for the purpose of questioning Davis and

Brown, petitioner has not demonstrated a reasonable probability such questioning would have revealed exculpatory evidence, or evidence reasonably likely to change the outcome of petitioner's trial. Mr. Davis would not have implicated Brown as the robber, and Cornell Brown would not have confessed to the robbery or denied petitioner's involvement. Mr. Davis made three unequivocal identifications of petitioner as the man who robbed him. Investigator Jenkins made an unequivocal identification of petitioner on the voicemail recording describing how he personally robbed Mr. Davis. The jury clearly credited the State's evidence on the issue of identity, despite the defense's attempt to raise reasonable doubt by pointing the finger at Cornell Brown and questioning the adequacy of Jenkins' investigation. (*See* Ex. B, pp. 225-26 (defense opening statement), pp. 265-77 (defense closing argument).

The state court's rejection of petitioner's claim was not contrary to, and did not involve an unreasonable application of, the *Strickland* standard. Nor was the decision based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (*quoting* 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 774, 197 L. Ed. 2d 1 (2017) (*quoting Miller-El*, 537 U.S. at 327). The petitioner here cannot make that showing. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1. That the petition for writ of habeas corpus (doc. 1), challenging the judgment of conviction and sentences in *State of Florida v. Toran Keith Green*, Gadsden County Circuit Court Case No. 08-CF-622, be DENIED.

2. That the clerk be directed to close the file.

3. That a certificate of appealability be DENIED.

At Pensacola, Florida this 17th day of May, 2017.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.